RECORD NUMBER: 13-4810

# United States Court of Appeals
### *for the*
# Fourth Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

JAMES LESTER ROUDABUSH, JR.,

*Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

# OPENING BRIEF OF APPELLANT

EDWIN S. BOOTH
SHUTTLEWORTH, RULOFF, SWAIN
HADDAD & MORECOCK, PC
4525 South Boulevard
Suite 300
Virginia Beach, VA 23452
(757) 671-6083

*Counsel for Appellant*

CP COUNSEL PRESS • VA – (800) 275-0668

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................iii

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION................................................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ........................... 1

STATEMENT OF THE CASE................................................................. 2

    Statement of Facts.................................................................... 3

SUMMARY OF ARGUMENT ................................................................ 7

    Fifth Amendment Issue ............................................................ 7

    Prior Bad Acts........................................................................ 8

    Limits of relevant conduct and loss amount determination ............... 8

ARGUMENT ..................................................................................... 9

I.  Fifth Amendment Issue: the trial court erred in denying the
appellant's motion to suppress statements made to federal law
enforcement Agents, after the appellant invoked his Fifth
Amendment right to counsel............................................................. 9

    Standard of Review.................................................................. 9

    Argument ............................................................................... 9

II.  Prior Bad Acts: the trial court erred in allowing evidence of prior
bad acts, specifically transactions beyond the scope in time and
location of Counts 3-7 as charged in the indictment, which were
highly prejudicial, as proof of a scheme of conduct........................... 13

    Standard of Review.................................................................. 13

    Argument .............................................................................. 13

i

III. <u>Relevant Conduct and Loss Calculations:</u> the trial court erred in its application of the loss calculation and relevant conduct guidelines, when that conduct extended many years beyond the timeline of the case, was not part of the same course of conduct, was not clearly linked to mail or wire fraud specifically, was prepared in part by a third-party company hired by the JC Penny, the alleged victim, was provided to the probation officer without supporting documentation, and was never subject to cross-examination by the appellant ............................................................................... 17

Standard of Review ............................................................... 17

Argument ............................................................................. 17

IV. The information from a third-party was unreliable and not subject to cross-examination ............................................................ 19

V. The same course of conduct ............................................... 20

VI. Use of 40 years of unproven conduct to achieve a large loss amount is poor public policy ................................................. 22

CONCLUSION ........................................................................... 23

REQUEST FOR ORAL ARGUMENT ....................................... 23

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**

*Edwards v. Arizona*,
  451 U.S. 477 (1981)....................................................................... 10, 11

*Rhode Island v. Innis*,
  446 U.S. 291 (U.S. 1980) ................................................................. 11

*United States v. Alexander*,
  447 F.3d 1290 (10th Cir. 2006) ......................................................... 10

*United States v. Daughtrey*,
  874 F.2d 213 (4th Cir. 1989) ............................................................ 17

*United States v. Guijon-Ortiz*,
  660 F.3d 757 (4th Cir. 2011) .............................................................. 9

*United States v. Holness*,
  706 F.3d 579 (4th Cir. 2013). ........................................................... 10

*United States v. McBride*,
  676 F.3d 385 (4th Cir. 2012) .................................................. 13, 15, 16

*United States v. Miller*,
  316 F.3d 495 (4th Cir. 2003) ............................................................ 17

*United States v. Perkins*,
  363 F.3d 317 (4th Cir. 2004) .............................................................. 9

*United States v. Steffen*,
  741 F.3d 411 (4th Cir. 2013) ............................................................ 17

*United States v. Villanueva*,
  410 Fed. Appx. 638 (4th Cir. 2011) ................................................... 14

**Rules, Statutes, and Other Authorities:**

18 U.S.C. § 1343 ............................................................................... 2

iii

18 U.S.C. § 1543 ............................................................ 2

18 U.S.C.S. § 3661 ........................................................ 18

28 U.S.C. § 1291 ........................................................... 1

Fed. R. App. P. (4) (b) ................................................... 1

U.S. Const. Fifth Amendment ................................... *passim*

USSG § 2B1.1 ............................................................ 17

USSG § 1B1.3 ......................................................... 17, 20

## STATEMENT OF SUBJECT MATTER AND APPELLATE JURISDICTION

This appeal is from a final judgment of the United States District Court for the Eastern District of Virginia, Alexandria Division, in a criminal case pursuant to the Federal Rules of Appellate Procedure.  Fed.  R.  App.  P.  (4) (b). Title 28 USC § 1291 states that the United States Courts of Appeal have jurisdiction from all final decisions of the United States District Court.  This Court has jurisdiction over this matter.  Appellant timely filed a notice of appeal from the final judgment of the trial court pursuant to Fed.  R.  App.  P.  4 (b).

References the record shall be designated as R. _.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

The issues presented are:

I. Whether the trial court erred in denying the appellant's motion to suppress statements made to federal law enforcement Agents, after the appellant invoked his Fifth Amendment right to counsel. (Preserved – R. 23-33; 43-78)

II. Whether the trial court erred in allowing evidence of prior bad acts, specifically transactions beyond the scope in time and location of Counts 3-7 as charged in the indictment, which were highly prejudicial, as proof of a scheme of conduct. (Preserved – R. 122, 124)

III.    Whether the trial court erred in its application of the loss calculation and relevant conduct guidelines, when that conduct extended many years beyond the timeline of the case, was not part of the same course of conduct, was not clearly linked to mail or wire fraud specifically, was prepared in part by a third-party company hired by the JC Penny, the alleged victim, was provided to the probation officer without supporting documentation, and was never subject to cross-examination by the appellant. (Preserved – R. 319-323; 339-348)

## STATEMENT OF THE CASE

On June 13, 2013, the United States filed a superseding indictment in United States District Court in Alexandria, Virginia, charging the appellant with:

Count 1:    Forgery of a Passport in violation of 18 U.S.C. §1543

Count 2:    Use of a False Passport 18 U.S.C. § 1543

Counts 3-7:  Wire Fraud in violation of 18 U.S.C. § 1343

Trial counsel filed a motion to suppress the appellant's statements to law enforcement, which was heard, and denied, on July 19, 2013. The Honorable Claude M. Hilton, Unites States District Judge, presided over a two-day trial – on July 22-23, 2013 – that resulted in convictions on all counts, for which the appellant was sentenced on October 11, 2013 to 77 months of incarceration, a 3-year period of supervised release, and a $100 special assessment.

2

The appellant timely noted his appeal.

**Statement of Facts**

The government's basic contention at trial was simple: that the appellant engaged in a scheme of fraudulent returns, preying on JC Penney stores because of his particular knowledge of their return policies in order to generate cash returns, and utilizing a forged United States passport card in furtherance of the scheme. Each fraudulent return generated one of the five charged wire transactions.

The appellant was arrested on February 5, 2013 at a JC Penney store in Prince William County, Virginia. Agent Nelson, with the State Department, was working with local law enforcement officers to investigate the appellant for using a fraudulent passport card in the return fraud scheme. R. 104, 35-42.

On February 5, 2013, a Fairfax county detective called Agent Nelson to say that the appellant completed a return at the JC Penny at 2700 Potomac Mills Circle in Prince William County (the investigation of Mr. Roudabush evidently involved multiple state jurisdictions, and the federal government at this point). R. 35-42. Agent Nelson in turn called a Prince William County Detective, Jason Callahan, and asked him to travel to Potomac Mills and identify the appellant. R. 47. Detective Callahan found the appellant, spoke with him, and asked him to come back to the JC Penney store for an interview, which he did.  Detective Callahan told the appellant he was not under arrest at that time.

3

Detective Callahan began to question the appellant, but when he asked a JC Penney loss prevention employee – who was also present in the room – if a passport card was involved, appellant clearly invoked his right to an attorney; all questioning stopped at that time. R. 50. Detective Callahan then arrested appellant. A search incident to that arrest revealed a torn US passport card bearing the name Charles Adkins.

After the invocation, Agent Nelson arrived and met the appellant in the manager's office of the JCPenney store. R. 104. The passport card was sitting on the table near the appellant. R. 51. Agent Nelson was aware prior to entering the room that the appellant invoked his right to counsel, and that the passport card was discovered in the search incident to arrest. R. 51.

Detective Callahan testified that Agent Nelson began speaking to him about the investigation in front of the appellant. Agent Nelson then turned to the appellant, identified himself, and said that if appellant would like to speak with him at the Garfield police station - where appellant would be taken for arrest and processing - that Agent Nelson would be there and available to talk. R. 51.

Agent Nelson's notes indicate that "[d]uring introduction to SUBJECT, SA Nelson informed SUBJECT that he was a Federal Agent with the Department of State and advised his purpose was to investigate the Passport Card authenticity and use in his fraudulent transactions." R.37. Agent Nelson testified during the

4

suppression hearing that he only recalled discussing the passport, and not the case. R. 67-68. Agent Nelson testified that the appellant stated he wanted to speak with him. Specifically, the testimony from Agent Nelson at the motions hearing was:

> Q.    But you told him you'd be happy to speak with him later.
>
> A.    After he asked if I would speak -- if he could speak with me, yes. I made it clear to him during that process that he had invoked his rights and that we were going to respect it.

R. 68.

Agent Nelson further testified that the appellant explained his caution towards state law enforcement, and greater confidence in the federal government; and that appellant wanted to speak with him because he was federal law enforcement. R. 64. This distinction was part of the District Court's ruling in denying the motion to suppress. R. 74.

When the detectives and Agent Nelson, as well as the appellant, reached the Prince William County Police Station at Garfield, Agent Nelson interviewed appellant for a long period of time, and obtained detailed incriminating statements regarding the crimes he was charged with, which were summarized at trial. R. 108-118. In addition, a video recording of a portion of these statements was also admitted into evidence at trial. R. 127.

5

Agent Nelson testified for the government as to the majority of the evidence for Counts 1 and 2 – the counts related to forgery and use of a passport. He explained the differences between a US passport card and the passport card the appellant had at the time of his arrest, as well as appellant's statements regarding the passport card. R. 106-07.

The evidence in support of Counts 3-7, as well as the scheme of greater conduct described in the indictment, came from several current and former JC Penney employees, but also through Agent Nelson.  Agent Nelson prepared a map, based on nonreceipted return data from June 6, 2012, through February 5, 2013 that was provided by JC Penney. R.124-25; 273.  This map was admitted as government's Exhibit 12. R. 125. This map is a visual depiction of the record of non-receipted returns made by the appellant. There were approximately 120 transactions, and the map that was introduced as evidence (in Agent Nelson's words) "describes the states all the way up to Pennsylvania, as far down south as to Florida. It shows with red pins each JC Penney store where the subject had conducted nonreceipted refunds, and the black dots associated with each pin represents a transaction that occurred at that store." R. 125. The map was admitted over defense counsel's objection as proof of a scheme. R. 125.

William Michael Adams testified for the government. He was employed in loss prevention as a market investigator with JCPenney at all relevant times. Mr.

6

Adams testified that he "tracked" the appellant through returns. R. 147-48. Mr. Adams issued photo alerts to JCPenney stores, requesting information about the appellant. Those alerts led to information on geographic activity, as well as the particular return transactions caused by the appellant. R. 152. The particular type and/or brand of item returned fit in with the government's argument that the appellant selected particular categories of items to return. R. 286.

Mr. Adams further testified as to his research into the appellant's return history. He testified that he researched fraudulent transactions by the appellant, including the November 28 transaction – Count 3. R. 157-59.  The January 6 transaction – Count 4R. 160-61.. The January 9 transaction – Count 5. R. 162-64. And a transaction started on January 13, which resulted in a wire transaction on January 14, as Grant Moore testified – Count 6. R. 164-66; 262. Mr. Moore testified to the existence of a wire transaction in each of Counts 3-7. R. 254-62.

## SUMMARY OF ARGUMENT

### *Fifth Amendment Issue*

The appellant invoked his right to an attorney before he was charged with a crime. The appellant did not reinitiate contact with Agent Nelson. When Agent Nelson spoke to appellant he violated the appellant's broader, Fifth Amendment right to counsel, and obtained evidence in the form of a confession – used at trial and in calculations of relevant conduct and loss amount - that must be suppressed.

7

### *Prior Bad Acts*

The appellant made various evidentiary objections at trial. Over appellant's objection, the District Court allowed evidence of other bad acts as proof of a scheme. In particular, the court allowed testimony from Agent Nelson regarding over 100 transactions occurring up and down the East Coast, which were highly prejudicial and irrelevant to the wire fraud charges. This evidence was overly prejudicial and showed that – as the government argued – the appellant was a full-time fraud, who had been all over the East Coast engaged in this fraud for an extended period of time. This evidence could only lead to the jury to conclude that appellant must be guilty, because of his involvement in so many other bad acts.

### *Limits of relevant conduct and loss amount determination*

The presentence investigation report utilized a loss figure of over $600,000.00. This number was based on (i) information provided by the appellant to Agent Nelson and (ii) information provided by a third party hired by JC Penny. This third party, The Retail Equation ("TRE"), calculated what the anticipated loss attributable to the appellant might be based upon partial information regarding the appellant's return history. Taking the information from TRE, and appellant's confession, the probation officer determined that appellant was responsible for over $400,000.00 of loss when the most proven at trial was less than $30,000.00. Even with the wide range of relevant conduct and loss calculations that the District

Court may consider, this amount was inappropriately high. In addition, as a matter of public policy, criminal defendants should be encouraged to confess their crimes – if they choose to speak to law enforcement – without fear of a sentence enhancement based on 40 years of criminal conduct.

## **ARGUMENT**

**I.      Fifth Amendment Issue: the trial court erred in denying the appellant's motion to suppress statements made to federal law enforcement Agents, after the appellant invoked his Fifth Amendment right to counsel.**

## Standard of Review

The standard of review applicable to a denial of a motion to suppress is – with regard to the application of law – *de novo*; with regard to facts the standard is clear error. *United States v. Guijon-Ortiz*, 660 F.3d 757, 762 (4th Cir. 2011). The facts are construed in the light most favorable to the government as the prevailing party in the District Court. *United States v. Perkins*, 363 F.3d 317, 320 (4th Cir. 2004).

## **Argument**

The suppression issue was well-defined in the District Court. The appellant spoke with Detective Callahan after returning to the store he was accused of defrauding, invoked his right to counsel, and was arrested by Detective Callahan and later questioned by Agent Nelson. The government conceded that the appellant invoked his right to counsel, that the broader Fifth Amendment right to counsel

9

applied, and that the issue was whether or not he reinitiated conversation with law enforcement. In addition the government argued that the statement was voluntary. R. 72.

The Fifth Amendment to the United States Constitution is implicated in this case because the appellant invoked his right to counsel before being charged with a crime. His invocation extends to any contact with law enforcement – he expressed his desire to deal with the police only through counsel as to all matters. This Court has held that "…although the Sixth Amendment right to counsel is offense-specific, the similar right derived from the Fifth Amendment is not." *United States v. Holness*, 706 F.3d 579, 594 (4th Cir. 2013).

The appellant, without being prompted, invoked his right to an attorney as soon as he knew that law enforcement was concerned with a fraudulent passport. Although it is a Sixth Amendment case, the same rule articulated in *Edwards v. Arizona*, 451 U.S. 477 (1981) applies to the facts and issue presented in the instant case. *See e.g. United States v. Alexander*, 447 F.3d 1290, 1294 (10th Cir. 2006). The *Edwards* opinion states:

> We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police. *Id*. at 484-85.

10

Because the broader Fifth Amendment protection applies, Agent Nelson was forbidden to question the appellant unless he reinitiated communication, exchanges, or conversations with law enforcement. Agent Nelson was aware that: (1) the appellant invoked his right to counsel and (2) that the mention of passport fraud occurred immediately before the appellant invoked his right to counsel. For what purpose, other than encouraging the appellant to speak about the passport, did Agent Nelson enter the room? Police intent is a valid question given these facts. *See Rhode Island v. Innis*, 446 U.S. 291, 302 (U.S. 1980). The question is whether his actions were sufficient to constitute further interrogation.

Detective Callahan was clear in his testimony:

> Q. And you then had a conversation regarding transporting him to the Garfield station?
>
> A. Yeah. I informed him that he was going to be transported.
>
> Q. And Agent Nelson told him that he'd really like to speak with him?
>
> A. He said that if Mr. Roudabush wanted to speak with him once we got to Garfield, he would be there for that opportunity.
>
> R.58.

Agent Nelson's testimony is also important, as he clearly is operating from an *Edwards*/charge specific framework:

> Q. -- what is your impression of what it means when a defendant
>
> says that he wants an attorney?

11

A. That he invoked his *Miranda*.

Q. Okay. And that at that point, what are you able to do or not do? Are you able to keep talking to him?

**I. About that crime? No.**

Q. Okay. Are you able to talk to him about anything?

A. Well, you can ask him for his basic identifying information.

R.67 (bold emphasis added).

And Agent Nelson continues:

Q. Okay. Did you discuss the case in any way with Detective Callahan in that room in front of Mr. Roudabush at that point?

A. No. The only thing I recall discussing with Detective Callahan or in front of Mr. Roudabush at that point was the passport.

R. 67-68.

The passport – the mention of which caused the appellant to invoke his right to counsel – *is* the case, or at least a large part of it; an initial foothold of federal jurisdiction, which later led to wire fraud charges. Agent Nelson cannot separate the passport issue as if it is unrelated, when it clearly is a focal point of appellant's invocation of his Fifth Amendment rights.

Even under a deferential "clear error" review of facts regarding reinitiating contact, considering the location and circumstances of the interrogation, combined with the close working relationship between JC Penny, state law enforcement, and Agent Nelson (which bears on police intent) Agent Nelson's contact violated

12

appellant's Fifth Amendment rights and the statement, and all evidence derived from it, should be suppressed.

**II.    Prior Bad Acts:  the trial court erred in allowing evidence of prior bad acts, specifically transactions beyond the scope in time and location of Counts 3-7 as charged in the indictment, which were highly prejudicial, as proof of a scheme of conduct.**

## Standard of Review

Admission of prior bad act evidence is reviewed for abuse of discretion.

*United States v. McBride,* 676 F.3d 385, 395 (4th Cir. 2012).

## Argument

In this case, the District Court admitted evidence of a large number of fraudulent transactions, over a wide range of time and large geographical area, to allow the government to prove a scheme to defraud from November 28, 2012 until January 14, 2013.  There is a four part test governing the admissibility of prior bad acts:

> (1) The evidence must be relevant to an issue, such as an element of an offense, and must not be offered to establish the general character of the appellant. In this regard, the more similar the prior act is (in terms of physical similarity or mental state) to the act being proved, the more relevant it becomes. (2) The act must be necessary in the sense that it is probative of an essential claim or an element of the offense. (3) The evidence must be reliable. And (4) the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process.

> *McBride*, 676 F.3d at 396. (internal citations omitted).

13

In this case, the acts are undeniably similar, which weighs in favor of admission. It is important to note that, while extremely similar, the government argued at no time that the acts were "inextricably intertwined " with Counts 3-7. *See United States v. Villanueva*, 410 Fed. Appx. 638, 641 (4th Cir. 2011) (holding that such intertwined evidence admissible when "it forms an integral and natural part of the witness's accounts of the circumstances surrounding the offenses")(internal citations and quotations omitted).

Regardless of how similar, the prior bad acts are unnecessary to prove the charged counts. They are not intertwined to a point where proof of the prior acts is a necessary part of the government's case. The appellant confessed (although this is also an issue on appeal) to his scheme. There was direct evidence in the form of live testimony of his actions in the store on Counts 4 and 5. Mr. Adams, the market loss witness, and Mr. Moore, a wire fraud and computer witness, provided further direct evidence relating to Counts 3-7 in the form of documents, video footage still photographs, an internal investigation, and electronic wire records from JC Penny computer systems. The government treated this case as if it were a drug conspiracy, in a sense, and as if the numerous transactions were acts in furtherance of a conspiracy. But the instant case only involves one man, and there was no

14

essential claim or element of the offense that required testimony regarding so many

unrelated transactions.  The evidence was not necessary.[1]

Agent Nelson's testimony regarding Exhibit 12 is not especially reliable, as

there is no testimony about precisely how he obtained and/or vetted the

information – he simply testified that he prepared the map with information

provided by JC Penny. R. 124. Mr. Adam's testimony is at least more linear and

convincing  in terms of how he developed  the information, but both suffer under

---

[1] Two cases from the United States Court of Appeals for the Fourth Circuit, cited and succinctly discussed in *McBride*, address the issue of necessity.

> Two of our prior decisions provide helpful examples showing the type of connection required to find that the prior "bad act" evidence is "necessary" to prove the crime for which a appellant is on trial. In *Rawle*, the appellant was charged with a violation of the Travel Act, 18 U.S.C. § 1952, in connection with his participation in a marijuana importation conspiracy. 845 F.2d at 1245. We held that evidence of prior, similar marijuana importation by the appellant was admissible, because this evidence was necessary to demonstrate "a continuous course of conduct," an essential  element of the Travel Act. *Id*. at 1248.

> Likewise, in *United States v. Wells*, the appellant was charged with interference with Internal Revenue Service Agents. 163 F.3d 889, 892 (4th Cir. 1998). We held that evidence of the appellant's participation in a tobacco fraud and tax evasion scheme several years earlier was admissible, because this evidence provided context for the interference charge. *Id*. at 896. The appellant's attempt to evade conviction for the prior crimes had led to the charge of interference.

*United States v. McBride*, 676 F.3d 385, 398 (4th Cir. 2012)

the final portion of the test, whether "the evidence's probative value must not be substantially outweighed by confusion or unfair prejudice in the sense that it tends to subordinate reason to emotion in the factfinding process." *McBride,* 676 F.3d at 396.

On that issue, the jury heard testimony from federal law enforcement and an apparently high-ranking loss prevention employee, Mr. Adams. Agent Nelson and Mr. Adams essentially testified that the appellant was a longstanding fraud target of JC Penny and law enforcement. No reasonable group of citizens, when confronted with the quantity of transactions ranging from Pennsylvania to Florida, could do anything but conclude that the appellant is a dedicated fraudster. The sheer range and number of fraudulent transactions depicted on the map and in the testimony work upon the normal human emotions of any honest juror. This reaction is completely understandable. And that is exactly why this evidence was overly prejudicial, and not necessary to prove the 5 counts of wire fraud limited to the Eastern District of Virginia.

III.    **Relevant Conduct and Loss Calculations: the trial court erred in its application of the loss calculation and relevant conduct guidelines, when that conduct extended many years beyond the timeline of the case, was not part of the same course of conduct, was not clearly linked to mail or wire fraud specifically, was prepared in part by a third-party company hired by the JC Penny, the alleged victim, was provided to the probation officer without supporting documentation, and was never subject to cross-examination by the appellant.**

## Standard of Review

The standard of review applicable to relevant conduct and the use of the loss calculation require deference to the District Court's application of the USSG, but with a variable standard based upon the level of factual versus legal dispute: "[i]f the issue turns primarily on a factual determination, an appellate court should apply the 'clearly erroneous' standard." *United States v. Daughtrey*, 874 F.2d 213, 217 (4th Cir. 1989). In contrast, "[i]f the issue . . . turns primarily on the legal interpretation of a guideline term, . . . the standard moves closer to de novo review." *Id.* (quoted in *United States v. Steffen*, 741 F.3d 411 (4th Cir. 2013)). And this Court will "…review[] the District Court's interpretation of the term "loss" under the Sentencing Guidelines *de novo*." *United States v. Miller*, 316 F.3d 495, 498 (4th Cir. 2003).

## Argument

The question presented is whether such a long history of retail theft is relevant uncharged conduct for application under USSG § 1B1.3 and for use as a loss calculation in USSG § 2B1.1. The appellant concedes that the sentence is

17

otherwise lawful and within the statutory range, but contests the application of
those two sections to determine a loss amount of greater than $400,000.00. The
Presentence Investigation Report ("PSI") utilized the two considerations – loss
amount and relevant conduct – to achieve a loss amount that is drastically higher
than it should be in this case. This caused the appellant to receive a +14
enhancement, as opposed to a perhaps a +4 enhancement.   That's a substantial
increase, and could mean a sentence of 21-27 months instead of 77 months. The
appellant recognizes the expansive definition of relevant evidence at sentencing,
contained in both the United States Sentencing Guidelines and the United States
Code; "[n]o limitation shall be placed on the information concerning the
background, character, and conduct of a person convicted of an offense which a
court of the United States may receive and consider for the purpose of imposing an
appropriate sentence." 18 USCS § 3661**.**  Nonetheless**,** the appellant argues that
this loss calculation was inappropriate, and that as a matter of public policy
criminal defendants should be encouraged to confess without the fear that such a
long period of prior bad acts will be used to enhance their sentence.

Most of the conduct was beyond the statute of limitations in federal court,
and could never be proven. The use of relevant conduct outside the statute of
limitations is expressly approved in reported authority in other Circuit Courts of
Appeal. Although the United States Court of Appeals for the Fourth Circuit does

18

not have published authority stating as much, unpublished opinions suggest that this Court would decide the issue in the same way.

The probation officer received information from two sources: (i) a third party hired by JC Penny, TRE and (ii) information from appellant's confession. TRE supplied this information to the government and/or probation office. The probation officer used a relatively simple calculation to determine a loss calculation over a 40 year period, and concluded the loss was greater than $400,000.00.

## IV. THE INFORMATION FROM A THIRD-PARTY WAS UNRELIABLE AND NOT SUBJECT TO CROSS-EXAMINATION.

TRE prepared the estimate provided to the probation officer. No supporting documentation was attached to the PSI, and nothing was offered by the government to support the estimate beyond the recollection of some JC Penny employees (that admittedly stretched back to the 1980s). R. 330. The support for the calculation is contained in the Government's Position on Sentencing, which states:

> In terms of how the loss amount was calculated, JCP used the most recent, computerized data available that was generated by TRE (The Retail Equation) which tracked the defendant's fraudulent returns for the ten month period leading up to his arrest. The amount of loss was $47,896. Then, JCP annualized that total amount to determine the extent of the defendant's fraudulent activity each year was $34,277. The grand total of the defendant's fraudulent activity to JCP was calculated by multiplying the

19

annualized amount of loss ($34,277) by 24 years(which represents the number of years the defendant was engaged in retail fraud at JCP). The grand total figure of $822,648 was adjusted downward by 3% to account for inflation during that 24 year time period and amounts to $620,800. R. 330.

The appellant had no detailed information to examine, no real ability to cross-examine the calculations advanced in the PSI, and no way to verify that the extrapolations made by TRE were reasonably accurate or sustainable over 40 years, when their data only covered 10 months. R. 330. For these reasons, and even in light of the flexible standards for evidence utilized in sentencing, the District Court should have disregarded the TRE information, as requested in the Defendant's Objection to the Probation Officer's Assessment of Sentencing Factors. R. 319-23.

## V.    THE SAME COURSE OF CONDUCT.

The relevant conduct in this case was identified in the PSI as the "same course of conduct" – as opposed to a common scheme – pursuant to application note 9 to USSG § 1B1.3 in the PSI. That "same course of conduct" was used to determine the loss amount of more than $400,000 but less than $1,000,000. USSG § 1B1.3 application note 9 lists a number of factors for the District Court to consider, including the "similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses."

In this case, the offenses were similar, in the sense that the appellant had stolen from JC Penny - and other stores - for many years.  He confessed to stealing on a regular basis. However, there were substantial intervals in between the offenses, which the PSI clearly acknowledges:

> During his interview with law enforcement Agents on February 5, 2013, Roudabush stated he had been perpetrating fraud against JCPenney since 1973, or approximately 40 years. Roudabush has been incarcerated for approximately 15 of those years, so JC Penney estimated his total loss to be $620,800, which includes a reduction for inflation. R. 363.

Several of appellant's incarcerations were for the same basic conduct. And some of the victims were stores other than JC Penny, which suggests that the estimate of an annual loss of approximately $34,277 is far too high.  For example, he was sentenced to two years in prison in 2004 in Henrico County for his actions at a Target store "taking labels off of two cutting boards, priced at $7.99 and $9.99, and then placing those labels on two Sonicare electric toothbrushes, priced at $119.99 and $139.99, for a total loss of $242." R. 377, 378.  His pattern of stealing was broken by incarcerations, and the argument in favor of the "same course of conduct" can only be that he self-reported stealing from JC Penny over many years.

Most of the reported cases concerning the "same course of conduct" involve drug transactions, and the question is usually – but not always – whether those transactions are part of the larger conspiracy. This case is different. There is no

21

conspiracy, just one man who confessed to stealing many small amounts over a very long period of time. He did not use a passport card until the end of the 40 years, and there is nothing to indicate that his returns implicated mail or wire fraud, as opposed to obtaining cash in a register by false pretenses,  so the similarity is only the victim and the basic means of the fraud.

The distinction between simple theft or fraud, even with the same victim, as opposed to mail or wire fraud, should be relevant to the determination of whether the prior actions are relevant conduct. The government acknowledges that the appellant also used price switching in addition to fraudulent returns – and price tag switching alone, without the use of a gift card, was not proven at trial to involve a wire transaction – to steal over the 40 year time period. R. 331.

## VI.    USE OF 40 YEARS OF UNPROVEN CONDUCT TO ACHIEVE A LARGE LOSS AMOUNT IS POOR PUBLIC POLICY.

The United States argued at trial that appellant was responsible for over $29,000 in losses. R-286. The five counts of wire fraud totaled less than $1000 in losses.  The appellant estimated that he stole from JC Penny for 40 years, and confessed to an estimated amount; he is attributed with a loss of $675,920.00. It is excessive, and as a matter of public policy goes too far to enhance a sentence, and would discourage criminal defendants from truthfully confessing the extent of their crimes.

22

The appellant recognizes he could have received the same sentence, even if the trial court adopted his trial counsel's objection to the loss enhancement, for different reasons – such as his criminal history.  There is no rule limiting the proportion of what losses may be considered at sentencing, as compared to the amount proven at trial. But a sentence based on such a quantity of loss is inappropriate when the counts of conviction in this case involve less than $1000.00 directly attributable to the 5 transactions.

## CONCLUSION

For the foregoing reasons, the Appellant requests that this Court issue an order vacating the judgment and remanding the case for retrial or – if the court should find only the relevant conduct and loss calculation issue meritorious – resentencing.

## REQUEST FOR ORAL ARGUMENT

Counsel for the appellant requests oral argument.

Respectfully Submitted,

JAMES LESTER ROUDABUSH, JR.

_/s/ Edwin S. Booth_
Edwin S. Booth
Shuttleworth, Ruloff, Swain
   Haddad & Morecock, PC
4525 South Boulevard
Suite 300
Virginia Beach, VA 23452
(757) 671-6083

_Counsel for Appellant_

**UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT**

No. 13-4810        **Caption:** United States v. James Lester Roudabush, Jr.

**CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)**
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   [✓]    this brief contains _____3,376_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   [ ]    this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   [ ]    this brief has been prepared in a proportionally spaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*]; **or**

   [ ]    this brief has been prepared in a monospaced typeface using _____ [*identify word processing program*] in _____ [*identify font size and type style*].

(s) Edwin S. Booth _____

Attorney for Appellant _____

Dated: 3/19/2014 _____

04/13/2012
SCC

# CERTIFICATE OF SERVICE

I certify that on <u>March 19, 2014</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Kimberly Riley Pedersen
OFFICE OF THE U.S. ATTORNEY
2100 Jamieson Avenue 2nd floor
Alexandria VA 22314-5194
703-299-3843
kimberly.riley.pedersen@usdoj.gov

/s/ Edwin S. Booth
_____
Signature

3/19/2014
_____
Date